# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

Leonard F. Joy
*Executive Director and
Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

October 24, 2008

**Via ECF and By Hand**
The Honorable Roanne L. Mann
United States Magistrate Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   **In the Matter of the Extradition of Kushi Samuels, 08 M 445**

Your Honor:

I write on behalf of Mr. Kushi Samuels[1] to respectfully request that this Court refuse to certify the requested extradition to Canada on the grounds that there is insufficient evidence for a finding of probable cause. In the alternative, the Court should hold a full evidentiary hearing in order to properly assess the reliability of the evidence offered.

Canada seeks to extradite Mr. Samuels to try him for one count of first degree murder (in violation of Section 235 of the Criminal Code of Canada), and two counts of attempted murder (in violation of Section 239 of the Criminal Code of Canada). The charges stem out of a 1995 shooting at a party in Montreal, Quebec. On April 22, 1995, at approximately 2:45 a.m., gunshots were heard at a dance hall. (See the Affidavit of Stephen Abraham, Detective Sergeant for the Service de police de la Ville de Montreal (hereinafter the "Abraham Aff.") at ¶ 4). When the police arrived, they found two victims lying on the ground outside the front of the dance hall: Nicholas Rodriguez, who later died from his gunshot wounds, and Miguel Millings, who, as a result of his gunshot wounds, was permanently paralyzed from the waist down and lost the use of one eye. One other man was shot that night – Asher Manget. Mr. Manget, who was inside the dance hall at the time of the shootings, "sustained minor injuries to knees and to his right thigh." (See Abraham Aff. at ¶13). Canada seeks to try Mr. Samuels for the murder of Mr. Rodriguez, and the attempted murders of Mr. Millings and Mr. Manget.[2]

---

[1] I will refer to the defendant throughout this submission as Kushi Samuels. By doing so, I am by no means conceding the identity issue – i.e. that the defendant is in fact Kushi Samuels.

[2] Originally, the Montreal police had two suspects for the shootings: Mr. Samuels and Desta Barnes. Mr. Barnes, however, was murdered in Florida in 1998. (See Abraham Aff.. at ¶ 38

However, as set out in full below, the hearsay statements recounted in the Abraham Affidavit are self-contradictory and unreliable. and thus do not establish probable cause to believe that Mr. Samuels committed the crimes charged. While hearsay evidence is admissible in an extradition proceeding, such evidence should still contain sufficient indicia of reliability to justify a finding of probable cause. Here, the unsubstantiated hearsay statements contained in the affidavit lack those indicia. At best, the evidence establishes probable cause only for the shooting of Asher Manget inside the dance hall. Even if each of the witness's statements is credited, there is no evidence linking Mr. Samuels to the murder of Mr. Rodriguez and the attempted murder of Mr. Millings, which both took place outside the dance hall.

**The Abraham Affidavit**

In seeking Mr. Samuels' extradition, Canada relies exclusively on the Abraham Affidavit. In it, Detective Abraham explains that "the primary and secondary investigators in the murder case of Nicholas Rodriguez and the attempted murders of Miguel Millings and Asher Manget, have retired from the police force." (Abraham Aff. at ¶ 2). Accordingly, Detective Abraham recounts statements and other information from the police reports in the investigative file. Sometimes, the Abraham Affidavit quotes those statements verbatim, other times the statements appear to be in summary form and draw upon information contained within different police reports. Indeed, it is unclear whether the affidavit is quoting the various witness statements in full, or whether material parts of the statements have been omitted.

    a.    **The witness statements collected by the police**

On the night of the incident, police officers spoke with many different individuals. Notably, each witness provides different descriptions of the suspicious individuals who ran away from the dance hall when the shooting took place. Mr. Guy Chasse, the 9-1-1 caller, told the police that he saw two black people fleeing the scene. (See id. at ¶ 8). These two men were later identified as Patel Sanjay Kumar and Marlon Joseph, but when questioned, they "denied everything." (Id. at ¶ 11). A cook at a restaurant across the street from the dance hall also saw "two black men running," both of whom "were 5'8", 160 pounds and wearing dark clothing." (Id. at ¶ 19). Finally, Ms. Celine Labranche, a woman eating at a restaurant near the dance hall, said that she heard the shots and that she saw first "a short slim man, possibly a mulatto, coming towards her." When the individual saw Ms. Labranche, he put his hood over his head. Ms. Labranche then saw a second individual flee the scene. This man, however, was white, had long dark brown hair, was about 5'5", and weighed maybe 130 pounds. (See id. at ¶ 19).

One individual, John Adlan, was actually apprehended by the police running away from the dance hall. He was detained and, after speaking to a lawyer, stated that he "had nothing to do with the shooting," but that when he heard the shots, he ran out the back door of the dance hall. (See Abraham Aff. at ¶¶ 4-7, 16). He also told the police that "another black male was running out the back door following me" and that this other man "was carrying a pistol." (See id. at ¶ 16) (emphasis added). When Mr. Adlan spoke later to other police officers, he elaborated that the

man running behind him was slim, in his twenties, wearing a jacket, and "was holding a "<u>chrome 9 mm pistol in his right hand</u>." (<u>See id.</u> at ¶ 20) (emphasis added).

Four individuals who were inside the dance hall at the time of the shooting, reported to the police that they had only heard – and not seen – the shooting. (Abraham Aff. at ¶ 9). Indeed, the affidavit states that two police officers "met and identified all <u>ten</u> people that were inside the hall," but that "all were not cooperative." (<u>See id.</u> at ¶ 9) (emphasis added). None of these witnesses is reported to have seen anyone shooting <u>inside</u> of the dance hall.

### b. The ballistic evidence

The Abraham Affidavit also summarizes the results of various ballistic examinations. The actual ballistic reports are not attached, but Detective Abraham reports that four bullets were found inside the dance hall (three near the stage and one between the plated glass), one bullet was found outside the hall, and one bullet was found at the hospital, underneath the body of Nicholas Rodriguez. The police also recovered several casings. (<u>Id.</u> at ¶ 32). While Detective Abraham's summary of the ballistic reports is confusing and at times internally inconsistent, he concludes that two different guns were used – a 6.35 mm and a 9 mm. (<u>See id.</u> at ¶ 37). The four bullets recovered from <u>inside</u> the hall were all shot by the same 6.35 mm caliber firearm, and the two bullets found <u>outside</u> the hall (including the one found under Mr. Rodriguez) were shot from the same 9 mm gun. (<u>See id.</u>).

### c. The statements of Mr. Manget, Mr. Millings, and Mr. Bernard Gary Rodriguez

Three witnesses interviewed at the time of the shooting identify Mr. Samuels as being present at the party, but only one of those witnesses identifies Mr. Samuels as a gunman.

Mr. Asher Manget, who was shot in the knee and the hand inside the dance hall, identifies both Mr. Samuels and Mr. Barnes as the two gunmen responsible in the shooting. Having reported to the emergency ward for the grazed bullet injury to his hand and knee (Abraham Aff. at ¶ 13), Mr. Manget first told police that he heard "gunshots coming from outside" and that "the bullet passed through the shattered window." (<u>Id.</u>). One hour later, Mr. Manget made further statements – specifically that he "sustained injuries to his hand and knee by bullets that were fired by one of the suspects" and that he "would be able to identify the two suspects." (<u>id.</u> at ¶ 17). Several hours after that, Mr. Manget made a written statement at the police station. In that statement, Mr. Manget told the police that he was at the dance hall and saw Mr. Samuels and Mr. Barnes arrive at the party. According to Mr. Manget, he then saw Mr. Barnes go outside. (<u>See id.</u> at ¶ 21). Mr. Manget claims that while he was dancing, "Kushi was stand straight across from me when he shoot me in my right knee cap, left [thigh] and in my [left] hand." (<u>Id.</u>). At the same time, Mr. Manget claims that he could see Mr. Barnes outside shooting "in the direction of Nicky Rodriguez." (<u>Id.</u>) In Mr. Manget's account, unlike that of virtually every other witness, Mr. Samuels was "inside shooting on the dance floor." (<u>Id.</u>). Mr. Manget told the police that

after he was shot, he "ran" outside and saw Mr. Barnes and Mr. Samuels flee, presumably from the front of the dance hall. (Id.). Mr. Manget claims to know both Mr. Samuels and Mr. Millings personally. (Id.).

Mr. Millings, who was shot in front of the dance hall, does not identify either of the two suspects. In contrast to Mr. Manget, however, he places the two "suspects" outside the dance hall, "putting on the hoods of their jackets on their heads." According to Mr. Millings, when Mr. Nicholas Rodriguez went outside, "<u>one</u> of the suspects approached him and opened fire in the direction of his head." (See id. at ¶ 30). Mr. Millings appeared unwilling to cooperate, claiming he could not identify the suspects. However, he explained that once the suspects were arrested "he might change his mind and testify against them and that he might possibly be able to identify them in person." (Id.).

Mr. Bernard Gary Rodriguez, one of Mr. Nicholas Rodriguez's brothers, told the police that he knew Mr. Samuels and Mr. Barnes and he was "afraid" of them. (Abraham Aff. at ¶ 33). He recalled seeing them enter the hall just "a few minutes before the murder." A few minutes later, "<u>after both suspects went back outside</u>," Mr. Bernard Gary Rodriguez heard gunshots. (Id. at ¶ 33) (emphasis added). He then ran outside and saw his brother and Mr. Millings lying on the ground. (Id.). Notably, Mr. Bernard Gary Rodriguez said nothing about seeing anyone – let alone Mr. Samuels – shoot Mr. Manget <u>inside</u> the dance hall.

### d. The statements of Mr. Marcus Rodriguez

On June 20, 2008 – six weeks after the government obtained a provisional arrest warrant for Mr. Samuels and <u>thirteen years</u> after the shootings occurred – Canadian authorities spoke to Marcus Rodriguez, another brother of Nicholas Rodriguez. Although the police had at the time of the incident spoken to Bernard Gary Rodriguez, there was <u>no</u> prior mention of Marcus Rodriguez in the police investigative file. Indeed, none of the other key witnesses – Asher Manget, Gary Rodriguez or Miguel Millings – even mention Marcus Rodriguez as being present at the party.

Nonetheless, in a statement recorded "using a digital recorder," Mr. Rodriguez says that he went to the party with Bernard Gary Rodriguez, Asher Manget and Wilfred Jackson, and, moreover, saw Mr. Samuels at the dance hall. (See Abraham Aff. at ¶ 45). In contrast to the statements of Mr. Manget and Bernard Gary Rodriguez, Marcus Rodriguez recalls that Mr. Samuels was already at the party when they arrived. (Id.). After Marcus Rodriguez had been at the party for 45-60 minutes, Nicholas Rodriguez arrived at the party and went to the bathroom. Marcus Rodriguez says that he then saw Mr. Samuels walk to the front of the dance hall, and Nicholas Rodriguez and Miguel Millings exit the dance hall. A full half minute later, Marcus Rodriguez hears gunshots and takes cover behind a DJ table. "When the lights came on," Marcus Rodriguez saw Asher Manget who told him that he had been shot. (Id. at ¶ 45). Nowhere in his statement does Marcus Rodriguez say that he saw Mr. Samuels with a gun or shooting at any of the victims. In fact, he does not even say where Mr. Samuels is when he hears

the gunshots.

**The Allegations in the Abraham Affidavit Are Insufficient to Establish Probable Cause**

The contradictory double hearsay statements in the Abraham Affidavit are insufficient grounds for a finding of probable cause as to each of the charges against Mr. Samuels.

    a.    **Applicable law**

It is well established that before extradition can be ordered, there must be "sufficient evidence to support a finding of probable cause to extradite." See Austin v. Healy, 5 F.3d 598, 600 (2d. Cir. 1993); see Fernandez v. Phillips, 268 U.S. 311, 312 (1925). In making this evaluation, the extradition court should apply the familiar "totality-of-the-circumstances" test, i.e. make a "practical, common sense decision whether, given all the circumstances . . . there is a fair probability that" the defendant committed the crime charged. Illinois v. Gates, 462 U.S. 213, 238 (1983). The burden is on the requesting state to offer evidence that "will support a reasonable belief that [the person requested] was guilty of the crimes charged." Austin, 5 F.3d at 605. See also Matter of Extradition of Atta, 706 F. Supp. 1032, 1050 (E.D.N.Y 1989) (probable cause is that quantum of evidence "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt") (quotations omitted). Only when sufficient evidence of criminality has been found for each charge is extradition warranted. See, e.g., Collins v. Loisel, 259 U.S. 309, 315 (1922); Spatola v. United States, 925 F.2d 615, 617-18 (2d Cir. 1992).

Admittedly, probable cause is not an overly demanding standard, and a magistrate's obligation in an extradition hearing is not to "weigh conflicting evidence and make factual determinations" but rather, to determine "whether there is competent evidence to support the belief that the accused has committed the charged offense." Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir. 1986). As reiterated by the government, the Federal Rules of Evidence do not apply in extradition proceedings, see Fed.R.Evid. 1101(d)(3), and thus hearsay is permitted. See Collins, 259 U.S. 309.

Nonetheless, it is still the responsibility of the judge to look to traditional indicia of reliability in assessing the weight to be accorded to any hearsay evidence. Illinois v. Gates, 462 U.S. 213, 238-40 (1983). While the court may rely on hearsay, "this does not mean that the hearing court should act as a rubber stamp . . . a court must conduct an independent assessment of the evidence and closely examine the requesting country's submissions to ensure that any hearsay bears sufficient indicia of reliability to establish probable cause." In re Ben-Dak, 2008 U.S. Dist. LEXIS 29460 at *11-12 (S.D.N.Y. Apr. 11, 2008) (internal citations and quotations omitted). "The materials submitted must set forth facts from which both the reliability of the source and probable cause can be inferred." In Matter of Extradition of Ernst, 1998 U.S. Dist. LEXIS 10523, 1998 WL 395267, at *9 (S.D.N.Y. July 14, 1998) (denying extradition where it was "impossible to determine the veracity and bases of knowledge of the witnesses").

If the offered evidence lacks sufficient indicia of reliability, that evidence may "be accorded reduced weight by the court." United States v. Lui Kin-Hong, 110 F.3d 103, 121 (1st Cir. 1997) (finding no unreliability in that particular case) (internal quotations omitted); see also In re Williams, 496 F. Supp. 16 (S.D.N.Y. 1979) (denying request to extradite suspect to Canada because conclusory and speculative statements in affidavits did not establish probable cause); In re Ribaudo, 2004 U.S. Dist. LEXIS 1456 (S.D.N.Y. Jan. 30, 2004) (conclusory statements). In determining the weight to afford the evidence, an extradition court has the "authority and discretion to go beyond the face of the government's affidavits for purposes of determining credibility or reliability." Gill v. Imundi, 747 F. Supp. 1028, 1041 (S.D.N.Y. 1990) (granting petitioners writ of habeas corpus upon the discovery of new evidence that the confession upon which probable cause was based was untrue and involuntary because it was obtained by torture).

### b. The evidence fails to establish probable cause

Here, the offered evidence is insufficient to establish probable cause to believe that Mr. Samuels is guilty of the murder of Nicholas Rodriguez and the attempted murders of Miguel Millings and Asher Manget.

#### 1. *There is no evidence linking Mr. Samuels to the shooting of Mr. Rodriguez and Mr. Millings outside the dance hall*

Not a single witness identifies Mr. Samuels as shooting at Nicholas Rodriguez or Miguel Millings, the two victims shot outside the front of the dance hall. While Bernard Gary Rodriguez claims to have seen Mr. Samuels and Mr. Barnes leave the dance hall, he heard the shooting several minutes after he saw them exit the building. (See Abraham Aff. at ¶ 33). He did not see who did the shooting; indeed, given that several minutes had passed between the time that Mr. Samuels went outside and when Bernard Gary heard the gunshots, his statements do not even establish that Mr. Samuels was present outside of the dance hall when Nicholas Rodriguez and Mr. Millings were shot. Marcus Rodriguez's statements do not add anything to the analysis. All he says is that he saw Mr. Samuels walk towards the "front." (Id. at ¶ 45).

While Mr. Manget identifies Mr. Samuels as shooting at him from inside the dance hall, his statements – if they are credited – have the effect of exculpating Mr. Samuels from any involvement in the shootings that took place outside the dance hall. The ballistics report makes clear that a 9 mm gun was used outside the dance hall, and another (a 6.35 mm weapon) was used inside the dance hall. If, as Mr. Manget claims, Mr. Samuels was responsible for the bullets shot inside the dance hall, he is clearly not responsible for the bullets that hit Mr. Rodriguez and Mr. Millings.

"Mere presence" of course is not enough to establish probable cause. Ybarra v. Illinois, 444 U.S. 85, 91-92 (1979). Here, that is all, at best, the evidence establishes as to the shootings

that took place outside the dance hall. Mr. Samuels thus cannot be extradited for the murder of Nicholas Rodriguez and the attempted murder of Miguel Millings. See also United States ex rel. Argento v. Jacobs, 176 F. Supp. 877, 882 (D. Ohio 1959) (granting petitioner's writ of habeas corpus in an extradition matter, holding that the only evidence worthy of consideration against petitioner was that he was in the vicinity of the crime after finding many of the hearsay statements implicating the petitioner lacked probative value because of vagueness, conjectures, contradictions, and later recantations).

Finally, while the Court may conclude that there is probable cause to link Mr. Samuels to the shooting of Asher Manget, any such finding does not permit the extradition of Mr. Samuels for the murder of Mr. Rodriguez or the attempted murder of Mr. Millings. Under the "principle of specialty," long recognized in international law, the "requisitioning state may not, without permission of the asylum state, try to punish the fugitive for any crimes committed before the extradition except for crimes for which he was extradited." Shapiro v. Ferrandina, 478 F.2d 894, 905 (2d Cir. 1973) (quoting Friedmann, Lissitzyn & Pugh, International Law 493 (1969)). This means that the extradition magistrate has an "obligation to separate the extraditable from the non-extraditable offenses in determining whether extradition should be granted." Id.; see also Caplan v. Vokes, 649 F. 2d 1336, 1343 (9th Cir. 1981) ("[T]he Second Circuit has held that the principle of specialty mandates a careful culling of extraditable offenses from non-extraditable offenses. . . . In our view, an adequate extradition proceeding must include in its record a specific delineation, as to each charge, of the legal theories under the requesting country's law by which the accused's conduct is alleged to constitute an extraditable offense.").

> 2. *Mr. Asher Manget's statements identifying Mr. Samuels as the gunman who shot at him inside the dance hall are in any event contradicted by the other available evidence and contain no indicia of reliability*

The government makes much of Mr. Asher Manget's statements identifying Mr. Samuels as the one who shot him inside the dance hall. But Mr. Manget's statements do not make any sense and thus are not reliable. When he first spoke to the police, Mr. Manget said only that he heard the shots from outside and suggested that the bullet that hit him came through the glass doors. (See Abraham Aff. at ¶ 13). In his written statement to the police, Mr. Manget's story is slightly different; he claims that Mr. Samuels was inside the dance hall and "was stand [sic] straight across from me when he shoot me in my right knee cap, left thy [sic] and in my left hand." (Id. at ¶ 21). He also claims in his written statement that while Mr. Samuels was shooting at him, he could somehow see – across the dark dance hall and outside into the street – Mr. Barnes shooting at Nicholas Rodriguez. (Id.). Further straining credulity, Mr. Manget claims that after being shot in the knee cap and thigh, he was able to run out the front of the dance hall fast enough to see Mr. Barnes and Mr. Samuels flee the scene. (Id.).

Not only are Mr. Manget's own statements inconsistent and implausible, they are directly at odds with other witness's statements. John Adlan, who the police apprehended

running away from the party, saw a man with a gun follow him out the <u>back</u> door of the dance hall, not the front, as Mr. Magnet claims.[3]

Moreover, the other witnesses who identify Mr. Samuels say that he left the dance hall, and went outside. Bernard Gary Rodriguez, who appears to know both Mr. Samuels and Mr. Barnes, says that both went outside the dance hall shortly before the shooting began. Mr. Millings, one of the victims outside the dance hall, says that "two suspects" were outside the dance hall, but that he saw only one of the suspects shoot Mr. Rodriguez. Indeed, immediately after the shooting, the police spoke to four people who were inside the dance hall. Unlike Mr. Manget, all reported to only <u>hearing</u> shots from outside the hall.

### 3. *The Court should hear additional evidence concerning two of the key witnesses against Mr. Samuels*

The Court should consider additional evidence about the unreliability of the witnesses against Mr. Samuels. Mr. Manget, the only witness against Mr. Samuels, has 19 adult criminal convictions. His first adult conviction (for robbery) was just a few months after the shooting, in September 1995. His most recent conviction was in April of this year. In fact, Mr. Magnet has been in court facing criminal charges every year between 1995 through 1998. Most significant, however, is the fact that between 1998-2001, Mr. Magnet was found "not guilty" of various charges on the grounds that he suffered from a mental disorder.[4]

Mr. Marcus Rodriguez, a witness with whom the Canadian authorities appear to have spoken for the first time after the provisional arrest warrant issued, also has a long arrest history. He has 21 criminal convictions since 1995. In fact, when the Canadian authorities spoke with Mr. Rodriguez in June 2008, he was in jail. Two weeks after his statement to the police identifying Mr. Samuels as being present at the dance hall, Mr. Rodriguez was released.

While I recognize that an extradition court does not usually consider issues bearing on the credibility of the witnesses, where, as here, there is nothing but hearsay evidence and the evidence offered is itself vague, riddled with contradictions, and unsubstantiated by any concrete proof, the extradition court should "go beyond the face of the government's affidavits" and make an independent assessment of reliability. See <u>Gill v. Amanda</u>, 747 F. Supp. 1028, 1041 (S.D.N.Y. 1990) (granting petitioners writ of habeas corpus upon the discovery of new

---

[3] Moreover, the cook who saw two men run away from the scene described both as being 5'8" and approximately 160 pounds. (<u>See</u> Abraham Aff. at ¶ 9). In the data sheet containing Mr. Samuels' fingerprints, it lists his weight as 54 kg, or approximately 119 pounds. (<u>See</u> Appendix B to the Abraham Aff.). However, the July 7, 2008 Diplomatic Note seeking Mr. Samuels' extradition, describes him as weighing 415 pounds.

[4] The information concerning Mr. Manget and Marcus Rodriguez's criminal convictions was provided by a Quebec Legal Aid attorney, Yves Gratton.

evidence that the confession upon which probable cause was based was untrue and involuntary because it was obtained by torture).

* * *

Based on the totality of the circumstances, the evidence here is not "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." Matter of Extradition of Atta, 706 F. Supp. 1032, 1050 (E.D.N.Y 1989). While certainly there is evidence that Mr. Samuels was present at the dance hall, there is no reliable proof that he was responsible for the murder of Nicholas Rodriguez, or the attempted murders of Miguel Millings and Asher Manget. Accordingly, I respectfully request that the Court refuse to certify Mr. Samuels' extradition, or, in the alternative, conduct a hearing at which Canada be required to produce additional evidence in support of its request.

Respectfully submitted,

/s/

Justine A. Harris
Staff Attorney
(718) 407-7403

cc: AUSA Winston Paes