```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,

                          Plaintiff,           OPINION AND ORDER

            -against-                          08–MJ-445 (RLM)

KUSHI SAMUELS,

                          Defendant.
----------------------------------------------------------------x
```

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

In response to a request by the government of Canada, the United States of America ("the government") moves under 18 U.S.C. § 3184 for this Court to certify the extraditability of Kushi Samuels ("Samuels" or "defendant") to Canada, where he is wanted on charges of one count of first degree murder and two counts of attempted murder, in violation of the Criminal Code of Canada. For the reasons described below, the government's request for certification of extraditability is hereby granted in its entirety.

## PROCEDURAL OVERVIEW

On May 9, 1995, Jean Parent, a Justice of the Peace in Canada, issued an information and arrest warrant charging Kushi Samuels with one count of first degree murder and two counts of attempted murder, in violation of sections 235 and 239, respectively, of the Criminal Code of Canada. See Affidavit of Law of Mario Longpré ("Longpré Aff.") ¶¶ 7-9. On May 9, 2008, upon a request from Canada, the government obtained a provisional arrest warrant in this district, charging Samuels with "being a fugitive from a foreign country to the United States." 5/9/08 Arrest Warrant Issued by Magistrate Judge Azrack (Docket Entry ["D.E."]

No. 2).[1]  Samuels was subsequently arrested in New York on or about May 19, 2008, see Longpré Aff. ¶ 10, and arraigned the next day.  See Minute Entry for Proceedings on 5/20/08 (D.E. No. 4).  This magistrate judge entered an order detaining Samuels pending extradition.  See id.  On July 7, 2008, the Embassy of Canada presented to the United States Department of State its formal request for Samuels' extradition.  See Declaration of Heather McShain ("McShain Decl.") ¶ 2.[2]  As defendant declined to waive extradition, the parties were instructed to brief the issues surrounding his extradition, see Minute Entry for Proceedings on 8/1/08 (D.E. No. 13), and they have done so.  See Memorandum of Law by the Government in Support of Extradition as to Kushi Samuels ("Govt. Mem."); Brief in Opposition to the Government's Request to Certify Mr. Samuels' Extradition ("Def.'s Br."); Reply Brief by the Government ("Govt. Reply Br.").  The Court heard oral argument on February 9, 2009.

## THE GOVERNMENT'S PROOF

The government has submitted affidavits with accompanying materials provided by Canadian authorities, including the affidavit of Stephen Abraham, a Detective Sergeant for the Montreal City Police Department.  See Affidavit of Stephen Abraham ("Abraham Aff.").  The Abraham Affidavit consists of summarized information gathered by various Canadian investigators who worked on the case, ballistics evidence, and statements from several eyewitnesses, setting forth the following factual allegations in support of a finding of probable

---

[1]  All Docket Entries refer to those filed via Electronic Court Filing in this district.

[2]  The McShain Declaration is part of the properly authenticated extradition package submitted by the government, in hard copy only, on August 13, 2008.

cause against Samuels:

On April 22, 1995, the 9-1-1 emergency center for the City of Montreal Police Department received a call reporting gunshots in the area of Notre Dame Street West in Montreal. Abraham Aff. ¶ 8. Several constables arrived on the scene at 4225 Notre Dame Street West and observed two victims lying on their backs, later identified as Nicholas Rodriguez and Miguel Millings. Id. ¶ 9. The individuals, who appeared to have multiple wounds, were transported by ambulance to two separate hospitals. Id. Nicholas Rodriguez was pronounced dead at the hospital later that day; the cause of death was a gunshot wound to the head. Id. ¶¶ 23, 26. As a result of the shooting, Miguel Millings was paralyzed from the waist down and lost the use of an eye. Id. ¶ 25. When interviewed in the intensive care unit of the hospital, Millings told two Detective Sergeants that he was shot by two suspects whom he did not know. Id. ¶¶ 25, 30. After first stating that he would not be able to identify his assailants, Millings then reported that there was a possibility he might be able to identify them in person. Id. ¶ 30.

Less than an hour after the shooting, Asher Manget ("Manget") arrived at the emergency room of the same hospital where Nicholas Rodriguez had been transported; Manget had sustained minor injuries to his knee and right thigh from a bullet grazing his legs while he was dancing inside the hall at 4225 Notre Dame Street West (the "dance hall"). Id. ¶¶ 9, 13. At the hospital, Manget told two constables that he heard gunshots from outside the dance hall, and the bullet that hit him had passed through a shattered window. Id. ¶ 13. Manget also informed Detective Sergeant Rodrigue Dionne that he would be able to identify the two

suspects involved in the shooting. Id. ¶ 17. Later that day, at the police station, Manget gave a detailed, handwritten statement in which he alleged that defendant Samuels had arrived at the party at the dance hall with another man named "Dasta," id. ¶ 21, subsequently determined to be Desta Barnes ("Barnes").[3] Id. ¶ 22. The two men both appeared to be "holding something under a cloth." Id. ¶ 21. Manget further claimed that after the two men bought a beer, Barnes went outside and began firing his weapon, while Samuels (who had started to follow him) "was inside shooting on the dance floor." Id. Manget recalled Samuels standing directly across from him and shooting him twice, following which Manget ran outside and saw both Samuels and Barnes fleeing. Id. Manget recognized Samuels, having lived with him for one month during the summer two years prior to the incident. Id. Upon being presented with a book of photographs of juveniles, Manget was able to positively identify Samuels as the person who shot him. Id. ¶ 22.

Investigators also interviewed Bernard Gary Rodriguez ("Bernard"), the brother of the deceased, who admitted being present at the shooting. Id. ¶ 33. Bernard stated that he knew both Samuels and Barnes, and saw them enter the dance hall a few minutes before the shooting. Id. Bernard heard gunshots a few minutes after both suspects exited the dance hall; when he rushed outside, he saw Nicholas Rodriguez and Miguel Millings lying on the ground. Id.

Marcus Rodriguez ("Marcus"), another brother of the deceased, was also present the night his brother was killed, although he did not make a statement to authorities until 2008.

---

[3] Manget identified a photograph of Desta Barnes to be the man he referred to as "Dasta." See Abraham Aff. ¶ 22. Desta Barnes was fatally shot in Miami on May 29, 1996. Id. ¶ 38.

Id. ¶ 45. In his 2008 statement, which was digitally recorded, Marcus claimed that shortly after he observed Samuels exiting the washroom and heading towards the front door of the hall, he saw Nicholas Rodriguez and Miguel Millings leave the building, following which he heard gunshots. Id. Manget jumped in front of Marcus, who hid behind a table. Id. Marcus then left the building and found his brother and Miguel Millings lying on the ground outside. Id.

At the time of the shooting, Sergeant André Cormier was driving past the dance hall when he heard what sounded like firecrackers. Id. ¶ 4. Sergeant Cormier detained an individual, later identified as John Adlam ("Adlam"), whom he spotted running from the scene. Id. ¶¶ 5-7. After being transported to the police station, Adlam gave detectives a statement in which he alleged that upon hearing gunshots, he ran out the back door of the building and jumped the fence towards the subway station, at which point he saw a slim male in his twenties, wearing a jacket and a black hat, and holding a chrome 9-millimeter pistol in his right hand. Id. ¶ 20. That male then jumped the fence and headed in the opposite direction from an approaching patrol car. Id.

Within an hour of the shootings, Constable Martin Ouellet examined the crime scene at 4225 Notre Dame Street West, recovering eleven casings and one bullet outside the dance hall, as well as three bullets inside the hall and one bullet between the plates of glass near the front door. Id. ¶ 14. Ballistics tests confirmed that the four casings found inside the hall were all fired by a 6.35-millimeter caliber firearm. Id. ¶ 37. The projectile recovered outside the hall and one recovered from the hospital under the body of Nicholas Rodriguez, id. ¶ 15, were both fired from the same 9-millimeter caliber firearm. Id. ¶ 37.

On these facts, Justice of the Peace Jean Parent issued an Information and Arrest Warrant charging Samuels with one count of first degree murder and two counts of attempted murder, in violation of the Criminal Code of Canada. Longpré Aff. ¶ 7.

## DISCUSSION

When a foreign state requests the extradition of an individual from the United States, the examining judicial officer in this country must follow the procedures set forth in Section 3184 of Title 18, United States Code. That statute, in relevant part, allows for any judge or magistrate judge[4] of the United States to hear evidence of criminality on the part of the person being held here on charges issued in a foreign state having an extradition treaty with the United States. See 18 U.S.C. § 3184. If the judicial officer determines that there is sufficient evidence to sustain the charge under the provisions of the governing treaty, he delivers such certification to the Secretary of State, together with a copy of all testimony taken. Id. Upon the issuance of a certificate of extraditability, the Secretary of State has the discretion to order the fugitive to be delivered to the extraditing country. See id.; Lo Duca v. United States, 93 F.3d 1100, 1104 (2d Cir. 1996).

Before issuing a Certificate of Extraditability, the Court must examine the evidence in order to ensure that: "(1) there is a valid Extradition Treaty between the United States and the requesting state; (2) there are criminal charges pending in the requesting state; (3) the individual before the court is the person sought by the requesting state; (4) the charges are

---

[4] In the Eastern District of New York, magistrate judges are specifically authorized to exercise the jurisdiction set forth in 18 U.S.C. § 3184. See Local Criminal Rule 58.1(b) of the Southern and Eastern Districts of New York.

extraditable offenses under the applicable treaty; and (5) there is probable cause to believe that the individual before the Court committed the crimes charged." See In re Extradition of Chan Hon-Ming, No. 06-M-296 (RLM), 2006 WL 3518239, at *3 (E.D.N.Y. Dec. 6, 2006) (citing In re Extradition of Waters, No. 03-M-1072 (CLP), 2003 WL 23185666, at *2 (E.D.N.Y. Nov. 24, 2003); In re Extradition of Ernst, 97 CRIM.MISC.1 PG.22 (HBP), 1998 WL 395267, at *4 (S.D.N.Y. July 14, 1998)). All prerequisites to extradition have been satisfied in the instant case.

**(1) Existence of a Valid Extradition Treaty**

Heather McShain, the Attorney-Adviser in the Office of the Legal Adviser for the United States Department of State, has attested to the existence of a valid extradition treaty between the United States and Canada, as required by 18 U.S.C. § 3184.[5] See McShain Decl. ¶¶ 1-3. Defendant does not dispute the existence or validity of such treaty. In addition, reported cases from other districts confirm the existence of a valid extradition treaty between the two countries. See In re Coleman, 473 F.Supp.2d 713, 716 (N.D. W. Va. 2007); see also Matter of Extradition of Schweidenback, 3 F.Supp.2d 118, 118 (D. Mass. 1998). Therefore, this Court is satisfied that there exists a valid extradition treaty between the United States and Canada.

---

[5] See Treaty of Extradition between the United States and Canada ("Treaty"), Dec. 3, 1971, 27 U.S.T. 983; Protocol Amending the Extradition Treaty ("Protocol"), U.S.-Can., Jan. 11, 1988; Second Protocol Amending the Extradition Treaty ("Second Protocol"), U.S.-Can., Jan. 12, 2001. Copies of the above are appended to the McShain Declaration, which in turn is Exhibit 2 to the extradition package.

### (2)-(3) Criminal Charges Pending Against Samuels in Canada

The official documents submitted by the government of Canada establish that Samuels has been charged with one count of first degree murder, in violation of section 235 of the Criminal Code of Canada, and two counts of attempted murder, in violation of section 239 of the Criminal Code of Canada. See Longpré Aff., Ex. A, Arrest Warrant; see also McShain Decl., Note No. 0189 from the Canadian Embassy. These charges have been pending since a Canadian arrest warrant was issued for Samuels on May 9, 1995. See Longpré Aff., Ex. A, Arrest Warrant.

The Canadian government's request for extradition also includes evidence establishing that defendant is the same Samuels wanted in Canada on these charges. Specifically, Canadian authorities supplied a photograph of Kushi Samuels, which appears to be the same person as the defendant in custody in this district, as well as a fingerprint card that matches defendant's fingerprints. See Abraham Aff. ¶¶ 40-42; id. App. A & B. While defendant has not conceded the issue of identity, see Def. Br. 1 n.1, he does not challenge any of these facts. Moreover, after his arrest on May 19, 2008, the individual before this Court signed a consular notification form with the name "Kushi Samuels." See Govt. Mem. 10; Ex. 4 of Extradition Package. Based on this undisputed information, there is probable cause to believe that the individual before this Court is indeed the same Kushi Samuels who is wanted on criminal charges in Canada.[6]

---

[6] Curiously, the Diplomatic Note from the Embassy of Canada describes Samuels as "5'6" in height; weigh[ing] 415 lbs . . . . " See McShain Decl., Note No. 0189 from the Canadian Embassy. That this is a typographical error is evidenced by the photograph of Samuels attached to the extradition request, which clearly shows a man weighing less than 415 pounds,

(continued…)

-8-

### (4) Extraditability of the Charges and Dual Criminality

The Treaty between the United States and Canada ("Treaty") describes an extraditable offense as "conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment." Protocol (attached to McShain Decl.), art. I (replacing previous language requiring that the offense be listed in the Schedule annexed to the treaty in order for it to be extraditable). In other words, the Treaty's definition of extraditable offenses expressly incorporates, and is co-extensive with, the principle of dual criminality, which requires that an extraditable offense "be a serious crime punishable under the criminal laws of both the surrendering and the requesting state." See United States v. Medina, 985 F.Supp. 397, 400 (S.D.N.Y. 1997); Chan Hon-Ming, 2006 WL 3518239, at *4. The "dual criminality" analysis provided for in the Treaty must be performed for each charge separately to determine if it is an extraditable offense, as the "defendant may be prosecuted only on extraditable charges." See Waters, 2003 WL 23185666, at *5 (citations omitted).

Defendant does not dispute that each of the Canadian charges constitutes an extraditable offense. The provision in the Criminal Code of Canada under which Samuels was charged with murder carries a potential sentence of life imprisonment for conduct "where the person who causes the death of a human being . . . means to cause his death." Criminal Code of Canada, R.S.C., ch. C-46 §§ 229, 235 (1985). Attempted murder is also punishable in

---

[6](...continued)
and by the fact that the defense merely mentioned in passing the 415-pound reference. See Def.'s Br. 8 n.3.

Canada by life imprisonment for anyone "who attempts by any means to commit murder."[7] Id. § 239. Similarly, murder is defined under United States law as "the unlawful killing of a human being with malice aforethought," which is likewise punishable by imprisonment for life, or by death; attempted murder is punishable with a prison term of up to twenty years. See 18 U.S.C. § 1111 (1996), 18 U.S.C. § 1113 (2003).[8] Accordingly, as the pending charges of murder and attempted murder each individually satisfy the dual criminality requirement, they are extraditable offenses.

### (5) Probable Cause to Believe Samuels Committed the Crimes as Charged

The function of the United States judicial officer presiding over an extradition hearing is not to determine whether the evidence is sufficient to justify a conviction; rather, it is "to determine whether there is competent evidence to justify holding the accused to await trial." Lo Duca, 93 F.3d at 1104 (internal quotations omitted) (citations omitted). In other words, an extradition hearing is "essentially a preliminary examination" in which the judge "determine[s] if there is probable cause to hold [the] defendant to answer for the commission of an offense." Id. at 1104 (internal quotations omitted); Chan Hon-Ming, 2006 WL 3518239, at *3. The standard of probable cause necessary to certify an extradition is that which is "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief

---

[7] Section 239 of the Criminal Code of Canada has been modified twice since Samuels committed the offenses. See Longpré Aff. ¶ 15. However, defendant does not dispute the government's assertion that the modifications, which post-date the charges against Samuels, do not apply to him. See id. ¶¶ 15-16.

[8] As detailed in the government's brief, the conduct charged is also unlawful under New York State law. See Govt. Mem. 17-18.

of the accused's guilt." Matter of Extradition of Atta, 706 F.Supp. 1032, 1050 (E.D.N.Y. 1989) (quoting Coleman v. Burnett, 477 F.2d 1187, 1202 (D.C. Cir. 1973)).

The evidence presented by the government in support of a finding of probable cause need not comply with the Federal Rules of Criminal Procedure or the Federal Rules of Evidence, and thus hearsay evidence and unsworn statements are admissible. See Simmons v. Braun, 627 F.2d 635, 636 (2d Cir. 1980); In the Matter of the Extradition of Ben-Dak, No. 06 Mag. 1540 (GWG), 2008 WL 1307816, at *4 (S.D.N.Y. Apr. 11, 2008). Moreover, while the defendant may present evidence that explains the government's proof and tends to negate a showing of probable cause, he may not provide evidence that "contradicts the demanding country's proof." Ben-Dak, 2008 WL 1307816, at *4.

Samuels contends that the evidence proffered by the government is insufficient to establish probable cause to believe that he committed the crimes as charged -- a prerequisite to his extradition. Specifically, Samuels argues that if the Court credits Manget's statement that Samuels was firing his weapon inside the dance hall, that would exculpate Samuels of the shootings outside the dance hall, negate a probable cause finding as to the latter shootings, and prevent Samuels from being extradited for those crimes under the principle of specialty. See Def. Br. 6-7. In addition, Samuels challenges the reliability of the witness statements recounted in the Abraham Affidavit, claiming they are contradictory and unreliable and cannot support a finding of probable cause for any of the three charges. See id. at 2. Finally, Samuels urges the Court to consider additional evidence, such as the criminal records of Marcus and Manget, and to disregard as unreliable their statements about the shootings. Id. at 8. The Court rejects these arguments for the reasons stated below.

### (a) Probable Cause and the Principle of Speciality

In his statement at the police station, Manget advised that Samuels stood "straight across" from him inside the dance hall and shot him in his knee, thigh and hand. See Abraham Aff. ¶ 21. Samuels argues that, if credited,[9] Manget's statement exculpates Samuels of involvement in the contemporaneous shootings of Nicholas Rodriguez and Millings outside the dance hall,[10] and that therefore the principle of specialty precludes him from being extradited for those crimes. See Def.'s Br. 6-7. Under the principle of specialty, a judicial determination of extraditablity must be made for each separate offense, as the extraditing country may not punish an individual for any crimes committed prior to extradition other than those for which he was extradited. See Shapiro v. Ferrandina, 478 F.2d 894, 905-06 (2d Cir. 1973); see also Waters, 2003 WL 23185666, at *7 n.4.

It is undisputed that Samuels did not personally pull the trigger on Nicholas Rodriguez and Millings outside the dance hall. Rather, the government contends that Samuels acted as the accomplice of Desta Barnes in connection with those shootings, and that Samuels is therefore responsible for those acts. See Govt. Reply Br. 2-3. According to the government, Samuels "arrived at the dance floor with Desta Barnes with the clear intention to shoot certain individuals and thereafter aided and abetted Desta Barnes in the ensuing shootings at the dance hall." Id. at 3.

---

[9] Defendant also challenges the reliability of Manget's statement and thus the factual basis for the charge arising out of the shooting of Manget. See *infra* pages 14-17.

[10] The shootings outside occurred simultaneously with the shooting of Manget inside the dance hall, see Abraham Aff. ¶ 21, and involved different guns: a 9-millimeter caliber firearm was used in the shootings outside the dance hall, whereas a 6.35-millimeter caliber firearm was used in the shooting inside. See id. ¶ 37.

As the defense conceded at oral argument, the government need not establish probable cause to believe that Samuels was the person who actually fired the shots at Nicholas Rodriguez and Millings. Under Canadian law, an aider and abettor may be charged and convicted as a principal. Specifically, section 21 of the Criminal Code of Canada provides in pertinent part that

> [e]very one is a party to an offence who (a) actually commits it; (b) does . . . anything for the purpose of aiding any person who commits it; or (c) abets any person in committing it.
>
> Where two or more persons form an intention in common to carry out an unlawful purpose and to assist each other therein and any one of them, in carrying out the common purpose, commits an offence, each of them who knew or ought to have known that the commission of the offence would be a probable cause of carrying out the common purpose is a party to that offence.

See Criminal Code of Canada, R.S.C., Ch. C-34 § 21 (1985); see also Longpŕe Aff. ¶ 13. So too under United States law, an aider and abettor is responsible for crimes committed by the aided party. See 18 U.S.C. § 2 (providing, in pertinent part, that "[w]hoever commits an offense . . . or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").[11]

Contrary to the defense argument, the evidence proffered by the government establishes probable cause to believe that Barnes and Samuels shared a common intent to engage in the shootings at the party. After his release from the hospital, Manget told the Canadian authorities that he saw Barnes and Samuels arrive together for a party at the dance hall, "both

---

[11] Because aiding and abetting is a theory of responsibility and not a separate crime, it need not be specifically charged. See United States v. Cooper, 375 F.3d 1041, 1049 (10th Cir. 2004); see also United States v. Private Sanitation Indus. Ass'n, 793 F.Supp. 1114, 1133-34 (E.D.N.Y. 1992); Labonté v. The Queen, [1996] 2 S.C.R. 167, 167.

of them . . . holding something under a cloth." See Abraham Aff. ¶ 21. Shortly thereafter, he saw Barnes and Samuels start to follow Nicholas Rodriguez outside, but Samuels stopped and opened fire at Manget inside the hall while Barnes was shooting Rodriguez outside. See id. In addition, Bernard Rodriguez, the brother of the deceased, reported to Canadian investigators that Barnes and Samuels arrived at the dance hall together and left a few minutes later, at which point Bernard heard gunshots. See id. ¶ 33.

Accordingly, even assuming that Samuels was not physically present when the shootings of Nicholas Rodriguez and Millings took place outside the dance hall, the evidence establishes probable cause to believe that he and Barnes were acting in concert as to all three shootings and thus Samuels is responsible for the murder and attempted murder that took place outside. In short, neither the principle of speciality nor the dual criminality provision of the Treaty precludes a finding of probable cause for any of the charges against Samuels.

**(b) Reliability of witness statements**

Samuels also claims that the government's case is based entirely on the "unsubstantiated hearsay statements" contained in the Abraham Affidavit, which, he argues, do not provide sufficient indicia of reliability. See Def.'s Br. 2. However, "[h]earsay statements of witnesses summarized in the affidavit of a foreign official are admissible and may be sufficient to warrant a finding of probable cause," United States v. Pena-Bencosme, No. 05-M-1518 (SMG), 2006 WL 3290361, at *9 (E.D.N.Y. Nov. 13, 2006) (collecting cases), even where such proof involves multiple hearsay and unsworn statements. See Chan Hon-Ming, 2006 WL 3518239, at *8. To be sure, in order to support a finding of probable cause, such hearsay statements

must identify the source of the information and may not consist of conclusory or speculative statements. See Ben-Dak, 2008 WL 1307816, at *6 (quoting Ernst, 1998 WL 395267, at *9).

Here, the Abraham Affidavit discloses the bases for its factual allegations: it identifies the authors of the police reports, as well as the ultimate sources of information, and details the statements made to and evidence collected by the police. Accordingly, the Court is entitled to accept as true the statements and offers of proof in the Abraham Affidavit. See Chan Hon-Ming, 2006 WL 3518239, at *7; cf. Ben-Dak, 2008 WL 1307816, at *6-7 (disregarding "unsourced portions" of affidavits).

In his primary challenge to a finding of probable cause, Samuels emphasizes the contradictions in the eyewitnesses' descriptions of the individuals seen fleeing the dance hall and the timing of the events that night. See Def.'s Br. 2-4. Although some eyewitness statements recounted in the Abraham Affidavit may be inconsistent with others, and/or internally inconsistent, evidence that "merely raises doubts about the reliability of the government's proof is insufficient to defeat an extradition request." Pena-Bencosme, 2006 WL 3290361, at *9 (collecting cases). The inferences to be drawn in the face of conflicting proof present an issue to be resolved at trial in the requesting country. See id.; see also Shapiro, 478 F.2d at 905. For these reasons, any contradictions in the witnesses' accounts do not negate the showing of probable cause based on their implication of Samuels in the shootings.

**(c) Additional Evidence on Unreliability of Witnesses**

Samuels also asks the Court to consider additional evidence of the unreliability of the witnesses against him, including the criminal records of Manget and Marcus Rodriguez, as well as Manget's mental health history. See Defendant's Ex. A; Def.'s Br. 8. Samuels

contends that this additional information underscores the unreliability of the statements from these two witnesses. See Def.'s Br. 8.

Although the Court has the "authority and discretion to go beyond the face of the government's affidavits for purposes of determining credibility or reliability," it is not required to do so. See Gill v. Imundi, 747 F.Supp. 1028, 1041 (S.D.N.Y. 1990). As stated previously, the right of the defendant to introduce evidence in an extradition hearing is "limited to testimony which explains rather than contradicts the demanding country's proof" and the precise scope thereof is largely a matter of the judge's discretion. See Shapiro, 478 F.2d at 905 (citations omitted) (upholding judge's refusal to examine the credibility of testimony and statements included in translated material). Hence, "a judge presiding over an extradition hearing does not need to permit evidence which calls into question the credibility of the government's witnesses." Germany v. United States, No. 06-CV-01201 (DLI), 2007 WL 2581894, at *8 (E.D.N.Y. Sept. 5, 2007) (citation omitted). This principle applies with particular force where, as here, the proffered impeachment proof consists of general background information and does not relate directly to the crimes with which the defendant has been charged. See Sandhu v. Burke, No. 97-CV-4608 (JGK), 2000 WL 191707, at *12 (S.D.N.Y. Feb. 10, 2000).

Here, the evidence proffered by Samuels, while not irrelevant to the credibility of Manget and Marcus Rodriguez, would in no way "obliterate" probable cause, which is the standard required for such evidence to be admissible in an extradition hearing. See id. at *6 (holding that "what tends to obliterate probable cause may be considered [by the extradition court] but not what merely contradicts it.") (citation omitted); see also id. at *12. The

proffered evidence does not establish, without more, that the statements made by Manget and Marcus Rodriguez about the shootings are inherently unreliable. See id. at *13 (distinguishing proof that a confession was coerced as the type of evidence that, in an extradition proceeding, diminishes the probative force of the evidence supporting probable cause). Instead, the information merely raises credibility questions to be determined at trial in Canada. See Shapiro, 478 F.2d at 905 (upholding exclusion of testimony offered to show that one declarant had previously blackmailed the extraditee and that the extraditee had not made certain fraudulent statements attributed to him; such testimony "would only pose a conflict of credibility" that should await trial in the requesting country). Accordingly, the Court need not admit the evidence offered by Samuels to prove the unreliability of the government's witnesses. In any event, even if considered, defendant's impeachment proof does not overcome the government's showing of probable cause in support of Samuels' extradition. See Pena-Bencosme, 2006 WL 3290361, at *9.

## CONCLUSION

For the foregoing reasons, this matter is certified to the Secretary of State in order that a warrant may be issued for the surrender of Kushi Samuels to the proper authorities of Canada in accordance with the applicable Treaty. It is further ordered that the United States Attorney for this judicial district shall forward a copy of this Opinion and Order, together with a copy of all transcripts of proceedings and copies of documents received into evidence in this matter, to the Secretary of State for the United States.

The Clerk is directed to enter this Opinion and Order into the ECF system.

**SO ORDERED.**

**Dated:** Brooklyn, New York
February 10, 2009

**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**